UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------X
EILEEN S. LAVENDER,

               Plaintiff,               <u>MEMORANDUM & ORDER</u>
                                    17-CV-6687(JS)(ARL)

    -against-

VERIZON NEW YORK INC., MICHAEL
DZUGAN, PETER ALAGNA, KEN
MONFREDO, FIOS MANAGER UNKNOWN
NAME,

               Defendants.
--------------------------------X
APPEARANCES
For Plaintiff:      Eileen S. Lavender, <u>Pro se</u>[1]
                   2705 Connecticut Avenue
                   Medford, New York  11763

For Defendants:     Erika D. Cagney, Esq.
                   Jessica Kastin, Esq.
                   Jones Day
                   250 Vesey Street
                   New York, New York,  10281

SEYBERT, District Judge:

         Presently before the Court are Plaintiff's Motion for Summary Judgment (hereafter "Pl.'s Motion") (ECF No. 70); and Defendants' cross-motion for Summary Judgment (hereafter "Cross-Motion") (ECF No. 76), each filed pursuant to Federal Rule of Civil Procedure 56.  Plaintiff argues she has satisfied her burden in establishing that Defendants discriminated against her in violation of the Americans with Disabilities Act of 1990 (hereafter

---

[1] The Hofstra <u>Pro Se</u> Legal Assistance Program assisted the litigant in the preparation of drafts of her summary judgment materials but does not appear on her behalf.

the "ADA"): (1) by failing to provide her with reasonable accommodations; and (2) for disparate treatment in failing to provide her with equal employment opportunities and terms, conditions, and privileges of employment. Defendants counter that: (1) the individual named defendants cannot be held individually liable since the ADA does not permit for individual liability; and (2) Plaintiff cannot satisfy her prima facie burden under the ADA because she was not a qualified individual under its terms.

For the reasons that follow, Plaintiff's Motion for Summary Judgment is DENIED, and Defendants' Cross-Motion for Summary Judgment is GRANTED IN ITS ENTIRETY.

BACKGROUND

I.   Facts[2]

     A.   The Parties

          Defendant Verizon New York Inc. (hereafter "Verizon," "Defendant," or "Company"), "is a global leader in delivering

---

[2] The following facts are taken from the Defendants' Local Rule 56.1 Statement (hereafter "Defs.' 56.1 Stmt.") (ECF No. 82); the Plaintiff's Local Rule 56.1 Counterstatement (hereafter "Pl.'s 56.1 Counterstmt.") (ECF No. 71); and Defendants' Local Rule 56.1 Counterstatement (hereafter "Defs.' 56.1 Counterstmt.") (ECF No. 83). Plaintiff failed to provide a coherent 56.1 statement of material facts but annexed to her counterstatement what the Court assumes to be Plaintiff's 56.1 statement; the Court will refer to this document as Plaintiff's statement of material facts going forward. Where necessary, the Court has also reviewed the evidentiary record to determine the material facts of this case.

innovative communications, information and entertainment products and services." (Defs.' 56.1 Stmt. ¶ 2.)

Kenneth Monfredo (hereafter "Monfredo"), Mike Dzugan (hereafter "Dzugan"), and Peter Alagna (hereafter "Alagna") (together the "Individual Defendants" and together with Verizon "Defendants") were, at various times, in Plaintiff's reporting chain during her employment with Verizon. (See Defs.' 56.1 Stmt. ¶¶ 3-5; Pl.'s 56.1 Counterstmt. ¶¶ 3-5.) Daniel Farrington (hereafter "Farrington") is a Verizon employee who was initially named as a Defendant in this case under the moniker "Fios Manager Unknown Name." (Defs.' 56.1 Stmt. ¶ 6; Pl.'s 56.1 Counterstmt. ¶ 6.) However, Farrington was never served with this lawsuit and therefore is not an individual defendant. (Id.)

Eileen Lavender (hereafter "Plaintiff") "is a Verizon Employee who is currently on disability leave." (Defs.' 56.1 Stmt. ¶ 1.) Plaintiff was placed on disability leave on November 17, 2015. (Pl.'s 56.1 Stmt. ¶ 3.)

B.    Verizon's Internal Policies and Processes

Verizon maintains both an Equal Employment Opportunities Policy (hereafter the "EEO Policy") and an Americans with Disabilities Act Policy (hereafter the "ADA Policy"). (Def.'s 56.1 Stmt. ¶¶ 8-9; Pl.'s 56.1 Counterstmt. ¶¶ 8-9.) In the EEO Policy, Verizon commits to "comply fully with all laws providing equal opportunity to all persons without regard

3

to . . . disability . . . or any other protected category under applicable law." (EEO Policy, Ex. A, ECF No. 78-1, <u>attached to</u> Ferrari Decl.) Similarly, Verizon's ADA Policy states that it is committed to "providing equal employment opportunities and treating qualified individuals with disabilities without discrimination in all employment decisions." (ADA Policy, Ex. B, ECF No. 78-2, <u>attached to</u> Ferrari Decl.)

Additionally, Verizon has a Health Impairment Plan, colloquially referred to as the "HIC Process," for employees who develop long-term or permanent impairments. (Def.'s 56.1 Stmt. ¶ 15; Pl.'s 56.1 Counterstmt. ¶ 15.) Generally, "[t]he first step [in the HIC Process] . . . requires departments to explore possible reasonable accommodations" for the affected employee. (HIC Process, Ex. B, ECF No. 81-2, <u>attached to</u> Cagney Decl., § 2.2.) However, where an accommodation cannot be made, the HIC Process includes a three-month job search designed to provide the employee with priority placement for other jobs within Verizon. (Pl.'s 56.1 Counterstmt. ¶ 16.)

Procedurally, "[i]f Medical[3] has indicated that the restriction will last more than six months . . . the HI-1

---

[3] Medical refers to MetLife, who, for the relevant period, "was Verizon's third-party administrator for its short term disability plan and provided medical support to the Workplace Accommodations Team relating to reviewing medical documentation for accommodation requests." (Murray Decl. ¶ 3 n.1.)

form . . . will be initiated by the Department." (Pl.'s 56.1 Stmt. ¶ 178; Def.'s 56.1 Counterstmt ¶ 178.) "If accommodation is made or if the restriction was removed by [Medical] a [c]ompleted [HI-2 form] should be sent to the HIC coordinator." (Pl.'s 56.1 Stmt. ¶ 179; Defs.' 56.1 Counterstmt. ¶ 179; HIC Process § 3.12.) A HI-3 form should be prepared to obtain Medical's concurrence "if a reasonable accommodation is not possible, but a lateral assignment can be made within the Department." (HIC Process § 3.13.) Where "no reasonable accommodation or lateral assignment can be made within the Department, an HI-3 Form must be completed listing reasons in Section I and signed by the employee's district level manager as Department Authorization." (Id. at § 3.14.) Additionally, pursuant to Section 3.15 of the HIC Process:

> The supervisor should arrange a meeting with the employee to determine his or her understanding of the restriction, and of the [] Medical recommendation. The supervisor must explain in detail the Health Impairment Process, including the provisions for restoral if a downgrade is necessary. Following the discussion, Section 1, page 2 of the HI-3 Form is completed, noting that the above information was explained to the employee, and the employee's signature is obtained. (If the employee prefers not to sign, the supervisor should make this notation.)

(Id. § 3.15 (emphasis added).)

C. Plaintiff's Career at Verizon

Plaintiff began working at Verizon as a Telephone Operator when the Company was known as NYNEX in 1997. (Pl.'s 56.1

Stmt. ¶ 2; Defs.' 56.1 Counterstmt. ¶ 2).  Plaintiff held this position until December 31, 2005. (Pl.'s Dep. Tr. I, ECF No. 71-31, <u>attached to</u> Pl.'s 56.1 Counterstmt., 40:5-18.) Subsequently, Plaintiff became a Field Technician (hereafter "FT") and began training for this role on January 1, 2006. (Pl.'s 56.1 Stmt. ¶ 4; Defs.' 56.1 Counterstmt. ¶ 4.)  Plaintiff's training for the FT role required participation in, <u>inter alia</u>, Pole Climbing School. (Pl.'s 56.1 Stmt. ¶ 5; Defs.' 56.1 Counterstmt. ¶ 5).  After training, Plaintiff was assigned to the "Enterprise Specials North Gang" (hereafter "Specials North"). (Defs.' 56.1 Counterstmt. ¶ 6; Pl.'s 56.1 Counterstmt. ¶ 22.)

FTs have numerous job responsibilities that require work in various environments. (Defs.' 56.1 Stmt. ¶ 23; Pl.'s 56.1 Counterstmt. ¶ 23.)  For example, an FT must work "outside in all weather conditions" and, <u>inter alia</u>, "climb[] poles and ladders, and work[] aloft for long periods using tools and test equipment." (Defs.' 56.1 Stmt. ¶ 23; Pl.'s 56.1 Counterstmt. ¶ 23.)  When climbing, FTs can use: (1) climbing poles; (2) six-foot ladders; (3) 24-foot ladders; and/or (4) bucket trucks. (Pl.'s 56.1 Counterstmt. ¶ 23.)  Plaintiff admits that climbing was "part of [her] job." (Pl.'s Dep. Tr. I 223:7-16.)  Indeed, the FT's official duties, including the climbing requirement, are articulated in a written job description. (See Field Technician Job Description, Ex. C, ECF No. 81-3, <u>attached to</u> Cagney Decl.

6

(hereafter the "FT Description").)   In addition to climbing, the FT Description "includes a 100-pound pushing, pulling, and lifting requirement."   (Defs.' 56.1 Stmt. ¶ 24; Pl.'s 56.1 Counterstmt. ¶ 24.)

Plaintiff admitted in her deposition that if there was a reorganization at the Company, or if she were transferred to a role outside Specials North, she could "end up doing" certain of the duties articulated in the job description that she did not presently perform as a Specials Technician, subject to receiving training for that specific job. (Pl.'s Dep. Tr I 216:7-16; 221:21-223:4.)   Plaintiff further admitted that the duties listed in Section F of the FT Description were "part of [her] job." (Pl.'s Dep. Tr. I 223:7-16.)   Alagna also testified that an FT must be able to climb. (Alagna Dep. Tr., Ex. 98, ECF No. 71-28, <u>attached to</u> Pl.'s 56.1 Counterstmt., 62:23-63:3.)   Further, Alagna testified that he believed climbing to be an essential function of Plaintiff's role.  (<u>Id.</u> at 185:4-6.)

A pole job requires use of steps or a ladder.  (Pl.'s Tr. 96:18-21.)  "Not every job requires climbing," and an FT does not know if climbing will be necessary "unless [he] go[es] out there and see[s]."  (Alagna Dep. Tr. 84:2-14.)

Regarding the 100-pound lifting requirement, Plaintiff testified that she could not lift 100 pounds, but also testified that she was never required to lift this much in her role as a

Specials Technician.   (Pl.'s Dep. Tr. I 49:9-14.)   Plaintiff testified that her job required her to lift no more than 60 pounds and that "[w]hen you were tested, you were required, and the [job listing] stated, [to lift] 60-pounds."   (Id.)   Plaintiff further testified that in Specials North she "never had to lift anything over 60-pounds [and that] [t]he heaviest thing that [she] ever had to lift was the ladder" because Specials North "don't have a lot of heavy equipment."   (Id. at 226:13-17.)

> 1.  Plaintiff Suffers Multiple Injuries While Working as an FT

In or around August 2006 "Plaintiff's company van was struck by a car while parked on [a] job site."   (Pl.'s 56.1 Stmt. ¶ 11; Defs.' 56.1 Counterstmt. ¶ 11.)   Then, on or around March 2007, Plaintiff's van was struck by a car while the van was stationary at a red light. (Defs.' 56.1 Stmt. ¶ 33; Pl.'s 56.1 Counterstmt. ¶ 33.)   The swelling caused by the injuries sustained in these accidents eventually impacted Plaintiff's ability to work as an FT.   (Pl.'s Dep. Tr. I 53:22-54:5.)   For example, Plaintiff testified that she "lost control of [her] hands," (id. at 54:15-54:16), and "would start to lose control of [her] left leg" getting out of the truck.   (Id. at 53:22-54:9.)   Sometime in 2007, while working aloft, Plaintiff lost control of her hands on two occasions causing her to have to improvise a means of remaining on the pole until function returned to her hands.   (Id. at 54:12-57:9.)

Due to her injuries, as of September 28, 2008, Plaintiff was restricted to "no lifting greater than 25 pounds." (Pl.'s 56.1 Counterstmt. ¶ 39.) Consequently, Plaintiff was unable to climb poles or use the 24-foot extension ladder. (Id.)

### 2. Plaintiff Volunteers for a Temporary Project

In 2008, "Plaintiff volunteered to work on a Bonding and Grounding temporary project." (Defs.' 56.1 Stmt. ¶ 40; Pl.'s Counterstmt. ¶ 40.) The Bonding and Grounding Project ran from approximately October 2008 to March 2010 and did not involve pole climbing since all work was ground level. (Pl.'s Counterstmt. ¶ 21; Pl.'s Dep. Tr. I 76:19-77:4.)

On November 7, 2008, Plaintiff had a third workplace accident when she fell down an outdoor set of stairs while working at a customer's home. (Defs.' 56.1 Stmt. ¶ 43; Pl.'s 56.1 Counterstmt. ¶ 43.) The fall injured Plaintiff's "[b]ack (spine), left leg (inclusive of hip), left knee, left arm (inclusive of shoulder), left elbow, and right wrist." (Pl.'s 56.1 Counterstmt. ¶ 44.)

### 3. Plaintiff Returns to Specials North

In or around March 2010, Plaintiff returned to Specials North, where she reported to Dzugan. (Pl.'s Stmt. ¶ 24.) At that time, Plaintiff's restrictions were "no carrying, pushing, or pulling greater than 25 pounds and no repetitive bend, kneel, squat, [or] crawl." (Pl.'s 56.1 Counterstmt. ¶ 46.) As such,

Plaintiff was unable to use any ladder weighing more than 25-pounds, including the 24-foot extension ladder used for pole climbing. (Defs.' 56.1 Stmt. ¶ 39; Pl.'s 56.1 Counterstmt. ¶ 39.) Plaintiff testified that at this time Verizon was accommodating her by giving her only ground level assignments or "tickets." (Pl.'s Dep. Tr. I 102:17-21.) Plaintiff contends that she utilized a yellow, 25-pound, six-foot ladder when the ticket required work on a drop ceiling, or above-head height and which was reachable by such ladder. (Pl.'s 56.1 Counterstmt. ¶ 47.) Additionally, Dzugan permitted Plaintiff to complete work "at her own pace," which allowed her to stretch and move around as necessary, as part of her restrictions. (Pl.'s Counterstmt. ¶ 48; Pl.'s Dep Tr. I 102:22-103:6; 241:17-242:18.) Plaintiff testified that there were occasions when pole jobs would come in and Dzugan was able to send her on them despite her inability to climb because he had prior knowledge that the location did not require climbing. (Pl.'s Dep. Tr. I 103:18-104:8.)

4. Plaintiff's Work in the Central Offices

In or around May 2011, Plaintiff volunteered for a temporary project in the Central Offices (hereafter the "CO"). (Pl.'s 56.1 Counterstmt. ¶ 51.) Plaintiff's duties at the CO differed from what she did as an FT. (Pl.'s Dep. Tr. I 117:3-11.) For example, Plaintiff was not required to climb poles, or carry any ladders used for pole climbing because the CO was equipped

10

with "stationary and rolling ladders and stairs."  (Pl.'s 56.1 Counterstmt. ¶ 51.)  Ultimately, the work that Plaintiff performed was only a portion of that which made up the duties of a Central Office Technician (hereafter "COT").  (Defs.' 56.1 Stmt. ¶ 77, Pl.'s Counterstmt. ¶ 77.)

At the CO, Plaintiff severed a tendon in her hand due to the repetitive pulling of wire, which was part of her job.  (Defs.' 56.1 Stmt. ¶ 52, Pl.'s 56.1 Counterstmt. ¶ 52.)  Plaintiff ultimately had to have hand surgery.  (Pl.'s Dep. Tr. I 153:9-22.)

Around April or May 2014, Plaintiff began to experience back spasms.  (Pl.'s Dep. Tr. I 126:4-15.)  Plaintiff testified that the back spasms restricted her movement and could "lock [her] in[to] a position." (Id. at 126:22-127:2.)  Ultimately, Plaintiff was out of work from approximately April 8, 2014 to May 2, 2014 for her back spasms, and from around July 9, 2014 until March 2015 due to her hand surgery.  (Defs.' 56.1 Stmt. ¶¶ 52, 53; Pl.'s 56.1 Counterstmt. ¶¶ 52, 53; Pl.'s Dep. Tr. I 157:14-17.)

> 5.   Plaintiff's Request for a Bucket Truck and Return to Work

On February 23, 2015, Plaintiff submitted a request for a bucket truck believing that it would increase her working abilities since climbing, aerial work, and working aloft were problematic for her.  (Pl.'s 56.1 Counterstmt. ¶ 55.)  A bucket truck alleviates the need to climb for particular jobs depending

11

upon the environment.   (Defs.' 56.1 Stmt. ¶ 55; Pl.'s 56.1 Counterstmt. ¶ 55; Pl.'s Dep. Tr. I 158:19-22.)   Not all aerial jobs can be completed with a bucket truck.   (Id.)   In Plaintiff's own words, the bucket truck "handles things that ladders can't do."   (Pl.'s Dep. Tr. I 158:11-15; 162:23-25.)   In Specials North Bucket Trucks were primarily used on cable failure jobs.   (Alagna Dep. Tr. 115:4-18.)   These cables torqued 50-100 pounds when pulled.   (Id. at 113:2-7.)   Additionally, using a bucket truck requires certain training which, at the time of her request, Plaintiff did not have.   (Pl.'s 56.1 Counterstmt. ¶ 55.) Ultimately, the bucket truck request was denied by Monfredo because there were no trucks available at that time.   (Defs.' 56.1 Stmt. ¶ 58; Pl.'s 56.1 Counterstmt. ¶ 58.)   Plaintiff recognized that Verizon's denial of her bucket truck request was non-discriminatory and was simply a result of non-availability of equipment.   (Pl.'s Dep. Tr. I 178:14-179:2.)

Plaintiff officially returned to work on March 16, 2015, under Dzugan.   (Defs.' 56.1 Counterstmt. ¶ 81.)   Plaintiff alleges that upon her 2015 return she discovered that her tools, which were allegedly put in storage in 2011, were no longer in storage. (Pl.'s 56.1 Stmt. ¶ 83; Defs.' 56.1 Counterstmt. ¶ 83.) Specifically, Plaintiff testified that a yellow six-foot ladder weighing 25-pounds was "changed out" to a heavier, orange, ladder weighing 30-pounds.   (Pl.'s Dep. Tr. I 265:2-11.)   Dzugan neither

12

recalled the ladder's existence nor whether it had ever been swapped out. (Dzugan Dep. Tr., Ex. 99, ECF No. 71-29, <u>attached to</u> Pl.'s 56.1 Counterstmt., 89:25-90:8; 94:5-24.) Similarly, Plaintiff claims that on April 14, 2015, she requested that Dzugan exchange the 30-pound ladder for another technicians 25-pound ladder; again, Dzugan did not recall Plaintiff's request. (Pl.'s 56.1 Stmt. ¶ 88; Dzugan Tr. 93:22-94:24.)

In May 2015, Plaintiff began reporting to Alagna who took over Dzugan's gang in Specials North. (Pl.'s 56.1 Counterstmt. ¶ 62.) Plaintiff was assigned to the Suffolk County Business Group (hereafter the "Business Group") as a universal technician. (<u>Id.</u> ¶ 73.) While supervising Plaintiff, Alagna testified that he would spend time each day going through job tickets to find jobs that Plaintiff could do and prioritize her for groundwork. (Def.'s 56.1 Stmt. ¶ 68; Pl.'s 56.1 Counterstmt ¶ 68.) Nevertheless, upon her return Plaintiff would receive jobs that she could not complete, including various pole jobs; when that occurred, Plaintiff returned them to dispatch and attempted to get groundwork jobs instead. (Pl.'s 56.1 Counterstmt. ¶ 72; Pl.'s Dep. Tr. I 202:5-17.) Plaintiff noted that in the Business Group it seemed that "anything that came in with an aerial box seemed to be going toward that department." (Pl.'s Dep. Tr. I 223:17-224:10.) Plaintiff further estimated that, on average, she was assigned pole jobs "pretty much daily" and that on some days

13

she was designated "multiple jobs." (Id. at 205:10-13.) Sometime in June 2015, Plaintiff returned to Specials North because the Business Group was disbanded. (Id. at 198:2-200:12; Pl.'s 56.1 Stmt. ¶ 111.)

In 2015, there was an increasing volume of pole work at Verizon. Alagna testified that "60 to 70 percent of [his department's] work [] require[d] being on poles" and that the volume per day could fluctuate between technicians; for example, "one person could have three [pole jobs], one person could have none." (Alagna Dep. Tr. 133:7-134:6.) Further, around May 2015 there was a shift to fiber optic lines from copper telephone lines and that while FTs "in other departments handled the fiber optic work [] Specials received the majority of the copper wire work." (Alagna Decl., ECF No. 79 ¶¶ 4, 5.) "Most of the copper wire work involved repairing the copper wire, which typically required climbing." (Id. at ¶ 6.)

While under Alagna, Plaintiff testified that she was restricted to a "helper" role which required Plaintiff to accompany other FTs and assist them on their tickets. (Pl.'s Dep. Tr. I 247:16-23; Pl.'s Dep. Tr. II, Ex. 101, ECF No. 71-32, attached to Pl.'s 56.1 Counterstmt., 286:18-21.) Plaintiff recalled Alagna telling her that she was "just a helper now." (Pl.'s Dep. Tr. I 248:6-8.) In response, Plaintiff requested refresher training in order to be removed from helper tickets. (Id. at 128:9-12; 129:3-

6.)  Consequently, in August 2015, Plaintiff went for four days of on-the-job training with FT Kevin Nolan (hereafter "Nolan.") (Defs.' 56.1 Stmt. ¶ 82; Pl.'s 56.1 Counterstmt. ¶ 82.)  While training with Nolan, Plaintiff was asked to carry his tool bag. (Pl.'s 56.1 Counterstmt. ¶ 82.)  Plaintiff was unable to carry the tool bag and had to return it to Nolan because it was not evenly weighted at each side.  (Id.)  This incident, coupled with having to sit in Nolan's truck for a prolonged period, caused Plaintiff to suffer a back spasm the following day, preventing her from being able to get out of a chair on her own.  (Pl.'s Dep. Tr. I 132:4-16.)  Afterwards, Plaintiff maintains that Alagna repeated that she would "never be more than a helper."  (Pl.'s Dep. Tr. 248:9-16.)

Plaintiff testified that: (1) in June and August 2015, she began receiving conflicting information from Alagna regarding whether she was going to be placed into the HIC Process (Pl.'s Dep. Tr. II 325:3-10); (2) from August through September 2015, she was denied overtime (Pl.'s 56.1 Stmt. ¶ 202; Pl.'s Dep. Tr. I 251:11-16); and (3) Alagna informed her that if she dropped her restrictions she would "be welcomed at Verizon" (Pl.'s Dep. Tr. II 310:8-19).

15

###### 6. Murray and Plaintiff Begin Discussing the Benefits of the HIC Program

Starting in May 2015, Alagna and Sonia Murray -- a Human Resource Consultant on Verizon's Workplace Accommodations Team (hereafter "WAT") -- were in contact regarding Plaintiff and her medical approvals. (Defs.' 56.1 Counterstmt. ¶ 122.) Plaintiff's restrictions as of June 15, 2015, were "no lifting, push/pull 25 [pounds], no standing, squatting 20 min[utes], [and a] stool to step up into truck." (Email Chain With Managers, Ex. A, ECF No 77-1, attached to Murray Decl.) On June 15, 2015, Murray emailed Alagna asking whether he could continue to accommodate Plaintiff's approved six-month restrictions. (Defs.' 56.1 Counterstmt. ¶ 126.) Alagna's reply is not part of the record. Regardless, in June 2015, Murray and Floyd Khemai (hereafter "Khemai") began contacting various Verizon managers to determine if any of them could accommodate Plaintiff. (Defs.' 56.1 Stmt. ¶ 88; Pl.'s 56.1 Counterstmt. ¶ 88; Email Chain With Managers, in toto.) Verizon speculates that this outreach was prompted by Alagna's inability to find Plaintiff productive work, though Plaintiff disputes this. (Defs.' 56.1 Stmt. ¶ 88; Pl.'s 56.1 Counterstmt. ¶ 88.) Ultimately, no manager was able to accommodate Plaintiff. (Defs.' 56.1 Stmt. ¶ 88; Murray Decl. ¶ 15.) Nevertheless, Plaintiff remained under Alagna's supervision until November 2015. (Pl.'s Dep. Tr. I 258:11-21.)

16

Sometime in 2015, Plaintiff and Murray discussed the HIC Process. (Defs.' 56.1 Stmt. ¶ 91; Pl.'s 56.1 Counterstmt. ¶ 91.) Verizon asserts that Murray explained that the HIC Process could potentially help Plaintiff find another position at the Company that she could perform by giving her priority over other categories of applicants for open Verizon positions. (Defs.' 56.1 Stmt. ¶ 91; Pl.'s 56.1 Counterstmt. ¶ 91.) However, Plaintiff denies that Murray explained the process fully. (Id.) In September 2015, Plaintiff applied to two open positions for COTs. (Pl.'s Dep. Tr. II 324:15-25; Pl.'s 56.1 Stmt. ¶ 133.) The official job description for the COT role has a lifting, pushing, pulling requirement of 60-pounds and requires climbing. (COT Job Description (hereafter the "COT Description"), Ex. G, ECF No. 81-7, attached to Cagney Decl.; Monfredo Decl., ECF No. 80, ¶ 5.) Additionally, under Section C(e) of the COT Requirements, a COT is required to, as part of one's daily functions: (1) "us[e] light to heavy equipment"; (2) us[e] ladders and climbing poles"; and (3) work[] in manholes, trenches, buildings, tunnels etc." (COT Job Description.) Monfredo, a former CO Manager that supervised COTs and thus has personal knowledge of the duties that they are required to perform, stated that COTs "are required to lift 60 pounds and to climb." (Monfredo Decl. ¶ 5.) Further, Monfredo stated that, in 2015, COTs "frequently had to lift ladders and other equipment that weigh[ed] well-over 25 pounds." (Id.)

Plaintiff testified that while COTs use ladders, the ladders are smaller and are "like small staircases." (Pl.'s Dep. Tr. II 323:20-324:8.) Plaintiff testified further that although the CO has "longer ladders," the ladders are "attached to the ceiling on wheels like library ladders." (Id. at 324:9-14.) Yet, Alagna testified that some of the CO outside ladders do not move and must be manually rolled by the employee. (Alagna Dep. Tr. 241:20-242:3.) On this point, Alagna estimated that such ladders can weigh from 50 to 75-pounds. (Id. at 242:5-6.) Moreover, Alagna estimated that COTs frequently are required to climb. (Id. at 234-35:18-9.)

Ultimately, Plaintiff's application was unsuccessful. (Pl.'s Dep. Tr. II 325:1-10.)

Earlier, in March 2015, Plaintiff testified that Murray requested Plaintiff obtain a one-year approval letter for her restrictions for submission to Medical. (Pl.'s Dep. Tr. I 167-69: 1-25.) Plaintiff stated that prior to Murray's involvement she had been sending information to Medical personally but that Medical had not been receiving the information. (Pl.'s Dep. Tr. I 167:16-22.) Murray then suggested having the Plaintiff send the information to her. (Id.) Plaintiff alleges that Murray advised her to send information that was detrimental to her keeping her job. (Id.) Specifically, Plaintiff alleges, and Verizon disputes, that Murray failed to inform Plaintiff that the information Murray

18

sent to Medical specifying the permanence of Plaintiff's restrictions could place Plaintiff on Permanent Short-Term Disability. (Pl.'s 56.1 Stmt. ¶ 143; Defs.' 56.1 Counterstmt. ¶ 143.) Plaintiff's initial claim for "indefinite workplace accommodations beginning" February 24, 2015, was ultimately denied by Medical as the "medical information provided" did not support the need. (MetLife Diary Notes, Ex. 46, ECF No. 71-13, attached to Pl.'s 56.1 Counterstmt.)

In June, when her next approval date was approaching, Plaintiff alleges, and Defendants dispute, that Murray requested the same doctor's note as previously submitted, but for the doctor to redate it so that Murray could submit it to Medical. (Pl.'s 56.1 Stmt. ¶ 145; Defs.' 56.1 Counterstmt. ¶ 145.) Murray also requested "extra medical records, tests" and various other unspecified information. (Pl.'s 56.1 Stmt. ¶ 146; Defs.' 56.1 Counterstmt. ¶ 146.) Medical denied the second request for approval because "the medical on file [was] insufficient to make a determination." (2015 Timeline, Ex. 17, ECF No. 71-4, at 2, attached to Pl.'s 56.1 Counterstmt.) However, on November 13, 2015, Medical approved Plaintiff's one-year restrictions and accommodations noting that they were "in alignment with the underlying disabling medical condition and the request [was] medically substantiated." (Pl Tr. 172:23-173:25; 2015 Timeline, at 2.)

19

### 7.   Plaintiff is Placed on Short-Term Disability and Inserted into the HIC Program

On November 16, 2015, Khemai emailed James Page, Operations Manager in Garden City, to determine whether Page could accommodate Plaintiff; Page replied that he could not. (Email Chain Between Khemai & Page, Ex. C, ECF No. 77-3, attached to Murray Decl.) Subsequently, on November 17, 2015, Plaintiff was informed by Alagna that she was going to be placed on permanent short-term disability leave because Verizon could no longer accommodate her restrictions. (Defs.' 56.1 Stmt. ¶ 94; Pl.'s 56.1 Counterstmt. ¶ 94.)

As per the HIC procedure, Defendant was required to arrange a meeting with Plaintiff whereupon Plaintiff's supervisor should have determined Plaintiff's understanding of the medical recommendation and explained to her in detail the health impairment process. (HI-3 Form, ECF No. 77-6, at 2, attached to Murray Decl.) Moreover, the Plaintiff was required to sign the HI-3 form indicating this explanation had been given. (Id.) Plaintiff's form contains neither her signature nor a notation to the effect that she preferred not to sign. (Id.) Rather, Plaintiff's supervisor noted that "employee is out [] due to health[,] and restrictions were discussed with her before." (Id.) Additionally, Section 2 of Plaintiff's HI-3 form was not completed by Medical. (Id.)

However, on December 8, 2015, Alagna sent Plaintiff a letter explaining that Medical had "certified that [she had] medical restrictions lasting more than six (6) months or for an indefinite period that prevent[ed] [her] from performing" her job. (Alagna Dep. Tr. 171:19-23; HIC Notice Letter, Ex. G, ECF No. 77-7, attached to Murray Decl.)  The letter explains that Plaintiff was placed into a 90-day job search which would expire on March 9, 2016.  (HIC Notice Letter.)  Additionally, the letter explained the benefits of the 90-day job search and advised Plaintiff to engage with the process.  (Id.)  Finally, the letter included contact information if Plaintiff had any inquiries.  (Id.)  During the 90-day job search Plaintiff was unsuccessful "in finding a new position within [her] work restrictions"; thus, on March 9, 2016, the 90-day job search expired.  (HIC Expiry Letter, Ex. H, ECF No. 77-8, attached to Murray Decl.)  Plaintiff testified that despite identifying a posting for a COT during the HIC Process, she was told she could not apply for it because of, inter alia, her 25-pound lifting restriction.  (Pl.'s Dep. Tr. II 350:5-23; 351:5-18.)[4]

---

[4] In October 2016, Plaintiff applied for Social Security Disability Insurance ("SSDI").  (Defs.' 56.1 Stmt. ¶ 105.)  Plaintiff's SSDI benefits began on April 16, 2019 and were made retroactive to October 14, 2016.  (Pl.'s 56.1 Counterstmt. ¶ 106.)

PROCEDURAL HISTORY

On or around August 3, 2016, Plaintiff filed a charge with the Equal Employment Opportunities Commission (hereafter the "EEOC"). On or around August 17, 2017, the EEOC sent Plaintiff a right-to-sue letter. (Right to Sue Letter, Ex. 1, ECF No. 1-1, attached to Compl.) Subsequently, on November 14, 2017, Plaintiff filed her complaint in this action alleging employment discrimination pursuant to the ADA. (See Compl. § II.) Specifically, Plaintiff alleges that: (1) Defendants failed to accommodate her disability; and (2) she experienced unequal terms and conditions in her employment. (Id. § III. A.) Plaintiff further alleges that Defendants "[r]efused to supply her with a van, to pay overtime that was approved/worked, denied equal training," and denied the use of "proper equipment equal to others." (Id.) Plaintiff demands: (1) reinstatement of her job, training and tools; (2) restoration of lost wages including lost raises; and (3) actual damages in the sum of $560,000. (Id. § V.)

On December 22, 2020, Plaintiff moved for summary judgment on her claims. (See Pl.'s Motion, in toto.) Plaintiff attached to her motion the declarations of six current/former Verizon employees (hereafter the "Third-Party Declarations"), the names of which Plaintiff had not previously disclosed. (See ECF Nos. 70-2 through 70-7, attached to Pl.'s Motion.) In her initial disclosures, Plaintiff identified, "CWA Local 1108 Members and

22

Staff, inclusive" as persons having "knowledge of the facts and circumstances surrounding Plaintiff's employment with Verizon, Plaintiff's job duties, interactions with management, interactions with other departments concerning Plaintiff, other companies contracted by Verizon, and any other information regarding Plaintiff's claim." (Init. Discl., ECF No. 87-2, attached to Pl.'s Opp'n.)  Plaintiff also attached to her Motion a supplemental declaration from herself.  (See ECF No. 70-8, attached to Pl.'s Motion.)

On April 9, 2021, Defendants cross-moved for summary judgment.  (See Defs.' Cross-Motion, in toto.)  Defendants' Cross-Motion for summary judgment was administratively terminated by the Court to be decided in conjunction with Plaintiff's Motion.  (See Sept. 30, 2022, Elec. Order.)

## ANALYSIS

### I.   Legal Standard

Pursuant to Rule 56(a), "[a] court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  "A fact is 'material' for these purposes when it might affect the outcome of the suit under the governing law."  Adamson v. Miller, 808 F. App'x 14, 16 (2d Cir. 2020).  Additionally, "'[a]n issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict

for the nonmoving party.'" Id. (quoting Jeffreys v. City of N.Y., 426 F.3d 549, 553 (2d Cir. 2005)). "If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." Hetchkop v. Woodlawn at Grassmere, Inc., 116 F.3d 28, 33 (2d Cir. 1997). Moreover, "the court is not to make assessments of the credibility of witnesses" on a motion for summary judgment, as "[c]redibility assessments, choices between conflicting versions of events, and weighing of the evidence are matters for the jury." Id.

On a motion for summary judgment the court considers "the pleadings, depositions, answers to interrogatories and admissions on file, together with any other firsthand information including but not limited to affidavits." Nnebe v. Daus, 644 F.3d 147, 156 (2d Cir. 2011). Further, while the court "may consider other materials in the record," it "need consider only the cited materials" in ruling on a summary judgment motion. FED. R. CIV. P. 56(c)(3); see also Pennington v. D'Ippolito, 855 F. App'x 779, 782 (2d Cir. 2021) ("[I]n ruling on a summary judgment motion the court need consider only the cited materials in the parties' submissions." (internal citations and alterations omitted)).

In reviewing the record, "the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is

sought." Sheet Metal Workers' Nat'l Pension Fund v. Vardaris Tech.
Inc., No. 13-CV-5286, 2015 WL 6449420, at *2 (E.D.N.Y. Oct. 23,
2015) (quoting McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir.
1997)).  When drawing inferences from evidence in the record in
favor of the non-moving party, however, a court should not accord
the non-moving party the benefit of "unreasonable inferences, or
inferences at war with undisputed facts." Berk v. St. Vincent's
Hosp. & Med. Ctr., 380 F. Supp. 2d 334, 342 (S.D.N.Y. 2005)
(quoting County of Suffolk v. Long Island Lighting Co., 907 F.2d
1295, 1318 (2d Cir. 1990)).

        "Once the movant has 'demonstrat[ed] the absence of a
genuine issue of material fact . . . the onus shifts to the party
resisting summary judgment to present evidence sufficient to
satisfy every element of the claim.'" Pennington, 855 F. App'x at
781 (alteration in original) (quoting Holcomb v. Iona Coll., 521
F.3d 130, 137 (2d Cir. 2008)).  To do this, "[t]he non-moving party
is required to 'go beyond the pleadings' and 'designate specific
facts showing that there is a genuine issue for trial.'" Id.

        "The fact that both sides have moved for summary judgment
does not guarantee that there is no material issue of fact to be
tried and that one side or the other is entitled to that relief."
Coutard v. Mun. Credit Union, 848 F.3d 102, 114 (2d. Cir. 2017).
Instead, "'the court must evaluate each party's motion on its own
merits, taking care in each instance to draw all reasonable

inferences against the party whose motion is under consideration.'" Id. (quoting Schwabenbauer v. Bd. of Educ., 667 F.2d 305, 314 (2d Cir. 1981)).

The Court notes that, "particularly where motions for summary judgment are concerned," Jackson v. Fed. Express, 766 F.3d 189, 195 (2d Cir. 2014), it is "obligated to afford a special solicitude to pro se litigants." Tracy v. Freshwater, 623 F.3d 90, 101 (2d Cir. 2010). Nevertheless, pro se litigants are "generally . . . required to inform themselves regarding procedural rules and to comply with them." Wilson v. Suffolk County Dist. Att'y, No. 21-CV-4815, 2021 WL 4311155, at *2 (E.D.N.Y. Sept. 22, 2021) (quoting Caidor v. Onondaga County, 517 F.3d 601, 605 (2d Cir. 2008)).

## II. Discussion

### A. Defendant's Motion to Strike Supplemental Declarations

First, the Court addresses Defendants' request to strike Plaintiff's supplemental declarations from undisclosed third-party witnesses.

Rule 26 requires a party to, "without awaiting a discovery request, provide to the other parties: (i) the name and, if known, the address and telephone number of each individual likely to have discoverable information -- along with the subjects of that information -- that the disclosing party may use to support its claims or defenses." FED. R. CIV. P. 26(a)(1)(A)(i). "[T]o

26

satisfy Rule 26, parties must make an unequivocal statement that they may rely upon an individual on a motion or at trial." Lujan v. Cabana Mgmt., Inc., 284 F.R.D. 50, 73 (E.D.N.Y. 2012) (citations omitted).  "The purpose of this disclosure is to alert an opposing party of the need to take discovery of the named witness." Badolato v. Long Island R.R. Co., No. 14-CV-1528, 2016 WL 6236311, at *4 (E.D.N.Y. Oct. 25, 2016) (quoting Pal v. N.Y. Univ., No. 06-CV-5892, 2008 WL 2627614, at *4 (S.D.N.Y. June 30, 2008)).

Pursuant to Rule 37(c)(1), "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) . . . the party is not allowed to use that information or witness to supply evidence on a motion . . . unless the failure was substantially justified or is harmless."  FED R. CIV P. 37(c)(1); see also Fleming v. Verizon N.Y., Inc., No. 03-CV-5639, 2006 WL 2709766, at *7 (S.D.N.Y. Sept. 22, 2006) (noting that Rule 37(c)(1)'s "preclusory rule applies on motions for summary judgment").  "The purpose of the rule is to prevent 'sandbagging' an opposing party with new evidence." Miss Jones LLC v. Shahid, No. 17-CV-0716, 2022 WL 4642716, at *6 (E.D.N.Y. Sept. 30, 2022) (citing Ventra v. United States, 121 F. Supp. 2d 326, 332 (S.D.N.Y. 2000)).  "The party that violates Rule 26 bears the burden of showing that its violation was either substantially justified or harmless." Avillan v. Donahoe, No. 13-CV-0509, 2015 WL 728169, at *7 (S.D.N.Y. Feb. 19, 2015) (quoting Agence France Presse v. Morel,

27

293 F.R.D. 682, 685 (S.D.N.Y. 2013)). However, "[d]espite the seeming[ly] self-executing nature of the preclusion sanction[,]" its imposition "remains within the trial court's discretion." Cates v. Trs. of Columbia Univ. in City of N.Y., 330 F.R.D. 369, 373 (S.D.N.Y. 2019).

Failure to comply with Rule 37(c)(1) is considered harmless where "there is no prejudice to the party entitled to the disclosure." Preuss v. Kolmar Labs., Inc., 970 F. Supp. 2d 171, 175 (S.D.N.Y. 2013) (quoting Am. Stock Exch. LLC v. Mopex, Inc., 215 F.R.D. 87, 93 (S.D.N.Y. 2002)). Additionally, "[s]ubstantial justification may be demonstrated where there is justification to a degree that could satisfy a reasonable person that parties could differ as to whether the party was required to comply with the disclosure request or if there exists a genuine dispute concerning compliance." Badolato, 2016 WL 6236311, at *5 (internal citations omitted).

In determining whether evidence should be precluded under Rule 37, courts must consider "(1) the party's explanation for the failure to comply with the [disclosure requirement]; (2) the importance of the testimony of the precluded witness[es]; (3) the prejudice suffered by the opposing party as a result of having to meet the new testimony; and (4) the possibility of a continuance." Patterson v. Balsamico, 440 F.3d 104, 117 (2d Cir. 2006) (quoting Softel, Inc. v. Dragon Med. & Sci. Commc'ns, Inc.,

118 F.3d 955, 961 (2d Cir. 1997) (alterations in original)). "Since Rule 37(c)(1) by its terms does not require a showing of bad faith," the Second Circuit has held that such a showing is not required before evidence may be precluded under Rule 37(c)(1); however, evidence of bad faith "can be taken into account as part of the party's explanation for its failure to comply." <u>Design Strategy, Inc. v. Davis</u>, 469 F.3d 284, 296 (2d Cir. 2006).

> 1. <u>Plaintiff's Supplemental Declarations from Third-Party Witnesses Are Stricken</u>

Plaintiff attached the Third-Party Declarations to her Motion without previously disclosing the names of the six current/former Verizon employees. Consequently, pursuant to Rules 26 and 37, Defendants argue that the Third-Party Declarations should be struck. (Defs.' Support Memo, ECF No. 76, at 34-35.) Plaintiff does not deny that she failed to comply with Rule 26 but counters that her failure to do so was both harmless and justified. (Pl.'s Opp'n, ECF No. 87, at 25-27.)

Plaintiff avers that her failure to comply with Rule 26 was not the result of "bad faith" or "callous disregard of the rules" and that she "had previously listed all union employees in her initial disclosures because she needed to determine which ones would be willing to speak out." (Pl.'s Opp'n. at 26.) Relatedly, Plaintiff argues that "[i]n an effort to gather witness statements from employees to support her case" she had tried "her best to

find those willing to speak under oath about Verizon's workplace environment, but she ran into great difficulty in doing so because most employees" that had initially been willing to testify subsequently refused "once they learned of her intentions to sue Verizon." (Id.)

The Court finds that Plaintiff violated Rule 26(a)'s mandatory disclosure requirements by failing to: (1) disclose the names of the six witnesses pursuant to Rule 26(a); and (2) for failing to supplement her initial disclosures when she learned of the names of the witnesses. Moreover, Plaintiff's explanation for her failure was neither harmless nor substantially justified. On this point, Fleming is particularly instructive, where the plaintiff attached, to her opposition to summary judgment, declarations from multiple witnesses whose names had not previously been disclosed pursuant to Rule 26(a)(1)(A). 2006 WL 2709766 at *7. In Fleming, the plaintiff argued that her failure to comply was "substantially justified" because, while she had pursued the witnesses diligently, "they had previously been unwilling to become involved in the litigation." Id. at *8. The Fleming Court rejected this argument noting that the defendant was prejudiced by Plaintiff's failure since "it [had] made its motion for summary judgment based on what it thought to be all of the evidence accumulated in discovery." Id. The court also found that the plaintiff's "excuse that the witnesses' participation in

the litigation was uncertain" did not "rise to the level of a 'substantial justification' for her failure to list them in her Rule 26(a) disclosures." Id. Moreover, the Fleming Court rejected the plaintiff's contention that, since all the undisclosed witnesses were employees of the defendant, defendant could have deposed them at any time noting that this was unreasonable as the defendant had thousands of employees. Id. at 9.

Here, the Court likewise rejects Plaintiff's contention that her failure to comply with Rule 26 is substantially justified due to her difficulty in finding cooperative witnesses. Discovery in this matter is closed, and Verizon has made its Cross-Motion based upon what it believed to be all the evidence in the record.[5] Verizon has had no opportunity to depose or otherwise probe the testimony of these witnesses. Further, the Court finds that Plaintiff's disclosure of "CWA Local 1108 Members and Staff, inclusive" in her initial disclosures does not suffice to provide Verizon with the requisite notice Rule 26 is designed to provide. Verizon likely has many employees that are members of this union; therefore, it would not be reasonable for Verizon to have deposed

---

[5] Discovery was initially scheduled to close on August 13, 2019. (See June 12, 2019, Am. Sch. Order.) Discovery was re-opened, and the discovery deadline extended to May 27, 2020, for the limited purpose of allowing Plaintiff to submit an expert report. (See Order, ECF No. 51.) No expert report was filed by Plaintiff. (See Case Docket in toto.)

or interviewed them all on the off chance they uncovered the employees Plaintiff intended to call to support her claims.

Consequently, the Court strikes the Third-Party Declarations.

2. <u>Plaintiff's Supplemental Declaration will be Stricken to the Extent it is Inconsistent with Her Deposition Testimony or Provides Only Generalized and Conclusory Statements Unsupported by Admissible Evidence</u>

"'The Second Circuit has held that a party cannot manufacture issues of fact by submitting an affidavit that contradicts her prior deposition testimony.'" <u>Prophete-Camille v. Stericycle, Inc.</u>, No. 14-CV-7268, 2017 WL 570769, at *5 (E.D.N.Y. Feb. 13, 2017) (J. Seybert) (citing <u>Gorzynski v. JetBlue Airways Corp.</u>, 596 F.3d 93, 104 (2d Cir. 2010)); <u>see also</u> <u>Moll v. Telesector Res. Grp., Inc.</u>, 760 F.3d 198, 205 (2d Cir. 2014) ("The 'sham issue of fact' doctrine prohibits a party from defeating summary judgment simply by submitting an affidavit that contradicts the party's previous sworn testimony." (emphasis omitted)); <u>Crescent Beach Club LLC v. Indian Harbor Ins. Co.</u>, 468 F. Supp. 3d 515, 547 (E.D.N.Y. 2020). However, where "the allegations in the affidavit, rather than contradicting, explain or amplify prior deposition testimony, then the affidavit may create a genuine issue of material fact to defeat summary judgment." <u>Prophete-Camille</u>, 2017 WL 570769, at *5 (quoting <u>Gorzynski</u>, 596 F.3d at 104); <u>see also</u> <u>Gilani v. GNOC Corp.</u>, No.

32

04-CV-2935, 2006 WL 1120602, at *3 (E.D.N.Y. Apr. 26, 2006) ("[The] 'sham affidavit' principle does not apply . . . where the deposition testimony and affidavit are not truly contradictory," i.e. "[w]hen an issue was not fully explored in the deposition, or the deponent's responses were ambiguous, subsequent clarification by affidavit is permissible.") (citing Palazzo v. Corio, 232 F.3d 38, 43 (2d Cir. 2000)).

Defendant argues that Plaintiff's supplemental declaration must be stricken or disregarded because it contains "self-serving, conclusory statements that frequently contradict [her] prior testimony" and that the timing of Plaintiff's submission of the declaration -- after Plaintiff received Defendants' Rule 56.1 Statement of Facts) -- evinces an intent "to create triable issues of fact where there are none." (Defs.' Support Memo at 34.) Plaintiff counters that her declaration is "supported by the record in many instances." (Pl.'s Opp'n. at 25.)

To the extent that it explains or amplifies testimony previously given, the Court need not strike Plaintiff's supplemental declaration in its entirety. However, the Court will disregard the supplemental declaration "to the extent that [it is] [] inconsistent with [Plaintiff's] deposition testimony." U.S. All. Fed. Credit Union v. Cumis Ins. Soc., Inc., No. 03-CV-10317, 2009 WL 2914368, at *15 (S.D.N.Y. Sept. 11, 2009). Likewise, the

Court will disregard Plaintiff's supplemental declaration to the extent it makes generalized and conclusory statements that are unsupported by admissible evidence.  See id.

B.   The ADA Does Not Provide for Individual Liability

As an initial matter, the Individual Defendants argue that Plaintiff's claims against them must be dismissed as a matter of law because the ADA does not provide for individual liability (See Defs.' Support Memo at 17); the Court agrees.

Title I, Section 12112(a) provides that, "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedure, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C.A. § 12112(a).  Where there is a violation of Title I, Section 12117(a) provides that "[t]he powers, remedies, and procedures set forth in sections 2000e-4 – 2000e-9 . . . shall    be    the    powers,    remedies,    and procedures . . . to any person alleging discrimination on the basis of disability."  42 U.S.C.A. § 12117(a).

In the context of employment discrimination, the Second Circuit has held that "the retaliation provisions of the ADA, which explicitly borrows the remedies set forth in Section 2000e-5 [of Title VII], cannot provide for individual liability."  Spiegel v. Schulmann, 604 F.3d 72, 79-80 (2d Cir. 2010).  While "[t]he Second

Circuit has not explicitly addressed whether there is individual liability under Title I of the ADA," Milner-Koonce v. Albany City Sch. Dist., No. 1:21-CV-1271, 2022 WL 7351196, at *5 (N.D.N.Y. Oct. 13, 2022), "[b]ased on the Second Circuit's guidance thus far, district courts under its supervision have routinely held that there is no individual liability at all under the ADA," Sears-Barnett v. Syracuse Cmty. Health Ctr., Inc., 531 F. Supp. 3d 522, 535 (N.D.N.Y. 2021); see also Sosa v. N.Y.C. Dep't of Educ., 368 F. Supp. 3d 489, 521-23 (E.D.N.Y. 2019) (dismissing ADA claims against individual defendants because "an individual cannot be liable for discrimination or retaliation claims under the ADA"); Blair v. L.I. Child and Fam. Dev. Servs., Inc., No. 16-CV-1591, 2017 WL 722112, at *8 (E.D.N.Y. Jan. 31, 2017) (recommending dismissal of federal claims to the extent that they were lodged against individual defendants because "both Title VII and the ADA prohibit individual liability on behalf of employees"), Report & Recommendation adopted, 2017 WL 728231 (E.D.N.Y. Feb. 21, 2017); Castro v. City of N.Y., 24 F. Supp. 3d 250, 259 (E.D.N.Y. 2014) (holding that the bar on individual liability announced in Spiegel "extends to claims brought pursuant to . . . Title I of the ADA," and collecting cases).

Thus, the Court denies Plaintiff's motion against the Individual Defendants, and, for the same reasons, the Court grants the Individual Defendants' Cross-Motion.[6]

C. Any Claims Regarding Conduct that Occurred Prior to October 8, 2015 are Time-Barred

Next, the Court addresses Defendants' argument that "Plaintiff's claims regarding conduct that occurred prior to October 8, 2015," are untimely. (See Defs.' Support Memo at 33.)

It is a condition precedent to filing a Title VII or ADA action in federal court that the plaintiff must timely file charges of discrimination with the EEOC. Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 712 (2d Cir. 1996); Harris v. City of N.Y., 186 F.3d 243, 247-48 (2d Cir. 1999). To be timely, charges must be filed with the EEOC within 300 days of the alleged discriminatory action. See Harris, 186 F.3d at 247 n.2 (citing 42 U.S.C. § 2000e-5(e)); see also Pilman v. N.Y. City Hous. Auth., 214 F. Supp. 2d 325, 327 (S.D.N.Y. 2002) ("The ADA incorporates by reference the limitations period set forth in Title VII (42 U.S.C.

---

[6] Plaintiff's reliance on Edelman v. Source Healthcare Analytics, LLC for the proposition that the ADA allows for individual liability is misplaced. 265 F. Supp. 3d 534 (E.D. Pa. 2017). See McDowell v. McDonough, No. 21-CV-0338, 2022 WL 4238229, at *1-2 (W.D.N.Y. Aug. 1, 2022) (finding that since Edelman analyzed the issue of individual liability under the FMLA that it did not support the proposition that Title VII, a separate and distinct statute, allowed for individual liability), Report & Recommendation adopted, 2022 WL 17626519 (W.D.N.Y. Dec. 12, 2022). The same analysis articulated in McDonough holds true for individual liability under the ADA.

§ 2000e-5(e)(1)) for employment discrimination actions" (<u>citing</u> 42 U.S.C. § 12117)).  Generally, "only incidents that [take] place within the timely filing period are actionable."  <u>Nat'l R.R. Passenger Corp. v. Morgan</u>, 536 U.S. 101, 114 (2002).

Plaintiff filed her charge of discrimination with both the EEOC and the New York State Division of Human Rights on August 3, 2016.  (<u>See</u> EEOC Charge, Ex. I, ECF No. 81-9, <u>attached to</u> Cagney Decl.)  As such, Defendant argues that any claims regarding conduct that occurred prior to October 8, 2015 are time-barred.  (Defs.' Support Memo at 33.)  Plaintiff counters that the continuous violation doctrine applies to make her claims timely since "from March through September 2015," Defendant engaged in actions that were part of a "continuous policy of ignoring or refusing [Plaintiff's] requests for reasonable accommodation."  (Pl.'s Support Memo at 20.)

"[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges."  <u>Morgan</u>, 536 U.S. at 102.  Similarly, discrete acts "which fall outside the limitations period, cannot be brought within it, even when undertaken pursuant to a general policy that results in other discrete acts occurring within the limitations period."  <u>Chin v. Port Auth. of N.Y. & N.J.</u>, 685 F.3d 135, 157 (2d Cir. 2012).  "Actionable discrete acts are often 'easy to identify,' generally because they involve material changes to an

employee's conditions of employment." Tassy v. Buttigieg, 51 F.4th 521, 529 (2d Cir. 2022) (citing Morgan, 536 U.S. at 122). "Examples include, 'termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation.'" Id. at 529-30 (citing Terry v. Ashcroft, 336 F.3d 128, 138 (2d. Cir. 2003)). As such, "[e]ach discrete discriminatory act starts a new clock for filing charges alleging that act." Morgan, 536 U.S. at 113.

"The continuing violation doctrine, where applicable, provides an 'exception to the normal knew-or-should-have-known accrual date." Gonzalez v. Hasty, 802 F.3d 212, 220 (2d. Cir. 2015) (citing Harris 186 F.3d at 248). However, "the continuing violation doctrine is heavily disfavored in the Second Circuit and courts have been loath to apply it absent a showing of compelling circumstances." Trinidad v. N.Y. City Dep't of Corr., 423 F. Supp. 2d 151, 165 n.11 (S.D.N.Y. 2006) (internal quotation marks omitted). Generally, the doctrine applies "to claims 'composed of a series of separate acts that collectively constitute one unlawful [] practice.'" Gonzalez, 802 F.3d at 220 (quoting Washington v. County of Rockland, 373 F.3d 310, 318 (2d Cir. 2004)). Thus, "[t]he continuing violation doctrine [] applies not to discrete unlawful acts . . . but to claims that by their nature accrue only

after the plaintiff has been subjected to some threshold amount of mistreatment." Id. (internal citation and alterations omitted). Typically, hostile work environment claims will implicate the continuous violation doctrine "[b]ecause their very nature involves repeated conduct [and] the 'unlawful employment practice,' . . . cannot be said to occur on any particular day [but instead] occurs over a series of days or perhaps years." Morgan, 563 U.S. at 103. Additionally, a continuous violation may also be found where "there is evidence of an ongoing discriminatory policy or practice." Harris, 186 F.3d at 248. In such instances, the time for filing a claim of discrimination "may be delayed until the last discriminatory act [made] in furtherance of" the discriminatory practice or policy. Id.

Insofar as Defendant argues that discrete acts of discrimination or retaliation, which are not part of a continuing violation, must be time-barred if they occurred prior to October 8, 2015, the Court agrees. In reviewing the parties' moving papers, the Court identifies the following allegations of wrongdoing which should be time-barred unless saved by the continuing violation doctrine:

> (1) Plaintiff's request for a bucket truck and the necessary training, made on February 23, 2015, and denied by Monfredo (Pl.'s Support Memo at 8);
>
> (2) Plaintiff's reassignment to the Business Group under Alagna's supervision;

Alagna's assigning Plaintiff to aerial, as opposed to groundwork, and the second denial of the use of a bucket truck, all occurring around the end of April, 2015 (id. at 8-9);

(3)   Alagna's denial of tools, equipment, a lighter six-foot ladder, all occurring sometime in May 2015 (id. at 9);

(4)   Alagna's refusal to provide Plaintiff with various tools, including a T-Berd meter, and a lighter ladder occurring in May or June 2015 (id.);

(5)   Plaintiff's unofficial downgrade to helper by Alagna in July 2015 (id. at 9-10);

(6)   Alagna's permanent downgrade of Plaintiff to the helper role occurring on August 6, 2015 (id. at 10); and

(7)   the denial of overtime work occurring sometime in August 2015 (Id. at 10-11).

"[A]n employer's rejection of an employee's proposed accommodation . . . does not give rise to a continuing violation." Elmenayer v. ABF Freight Sys., Inc., 318 F.3d 130, 134-35 (2d Cir. 2003); see also Francis v. Wyckoff Heights Med. Ctr., 177 F. Supp. 3d 754, 776 (E.D.N.Y. 2016). Instead, "the rejection is the sort of 'discrete act' that must be the subject of a complaint to the EEOC within 300 days." Elmenayer, 318 F.3d at 135. This is true since "[t]he rejection of a proposed accommodation is a single completed action when taken, quite unlike the 'series of separate acts' that constitute a hostile work environment." Id.; see also Whalen v. CSC TKR, LLC, No. 11-CV-1834, 2011 WL 6965740, at *3-4

(S.D.N.Y. Dec. 28, 2011) (finding that "plaintiff's repeated requests for the same accommodation do not change the fact that he filed his EEOC claim more than 300 days after he received notice . . . of [Defendant's] denial of his requested accommodation."). Additionally, "[i]t is well-established that transfers, demotions, failure to compensate adequately, and failure to promote are all discreet acts which do not constitute a continuing violation." Crosland v. City of N.Y., 140 F. Supp. 2d 300, 308 (S.D.N.Y. 2001), aff'd sub nom. Crosland v. Safir, 54 F. App'x 504 (2d Cir. 2002); see also Elzeneiny v. Dist. of Columbia, 125 F. Supp. 3d 18, 35 (D.D.C. 2015) (noting that a "failure to provide . . . tools was a discrete act of discrimination").

Plaintiff's argument that it was reasonable for her to "assume that some or all of her accommodation requests were in the process of being considered" from Fall 2014 through November 2015 and had not yet been "fully rejected" is unavailing and does not implicate the continuing violation doctrine. (Pl.'s Support Memo at 20.)  When Monfredo denied her request for a bucket truck, Plaintiff was on notice that Verizon would not be accommodating her in this way as of February 2015.[7] As such, any potential ADA

---

[7] To the extent Plaintiff may have argued that she did not have notice that Verizon would not be accommodating her bucket truck request in February 2015 because she did not consider Monfredo's denial of her request a discriminatory action, Plaintiff still had

claim based upon the denial of a bucket truck accrued the day Plaintiff received notice from Monfredo that she would not be accommodated in this manner.  See Elmenayer, 318 F.3d at 134 (holding that an unaccepted accommodation is a discrete act and, as such, timeliness should be "measured from the date when the proposed accommodation was rejected"); see also Whalen, 2011 WL 6965740, at *3-4 (finding that "plaintiff's ADA claim accrued [when his employer] first denied his requests for a different work venue").  Similarly, Plaintiff was on notice in May or June 2015 that Verizon would not accommodate Plaintiff's lifting or climbing restrictions by procuring her a 25-pound ladder when Alagna rejected Plaintiff's request.  Indeed, the same is true for all of Plaintiff's requested and subsequently denied accommodations, demotions, and rejections of overtime requests.

Generally, a failure to train is also a discrete act. See Tassy v. Buttigieg, 540 F. Supp. 3d 228, 235 (E.D.N.Y. 2021), aff'd 51 F.4th 521 (collecting cases).  However, where coupled with other allegations that a work environment was objectively severe and pervasive, such failure to train claims should instead be analyzed as part of a hostile work environment claim.  See

---

notice as of April 2015 when Alagna denied the bucket truck request for a second time.  Since Plaintiff considered Alagna's denial to be discriminatory, this conduct should have been the subject of an EEOC complaint when it occurred.  (See Pl.'s 56.1 Counterstmt. ¶ 58.)

_Tassy_, 51 F.4th at 530; _see also_ _Davis-Garett v. Urb. Outfitters, Inc._, 921 F.3d 30, 47 (2d Cir. 2019); _Gregory v. Daly_, 243 F.3d 687, 693 (2d Cir. 2001).

Here, Plaintiff brings no claims and alleges no facts that she was forced to endure a hostile work environment.[8] Consequently, the Court finds that Plaintiff's failure to train claims are discrete acts of discrimination that do not implicate the continuous violation doctrine. Consequently, the Court finds that the following acts are likewise time-barred since any claim based upon them accrued from the date Plaintiff received notice of these denials:

> (1) Alagna's denial of refresher training occurring sometime in May 2015 (Pl.'s Support Memo at 9); and
>
> (2) Alagna's refusal to provide training to Plaintiff on account of her inability to climb occurring on August 6, 2015 (_id._ at 10).

However, Plaintiff is not barred from using these prior acts as background evidence to support her timely claims. _Davis-Garett_, 921 F.3d at 42 (citing _Morgan_, 536 U.S. at 113).

---

[8] While Plaintiff testified that she had previously been harassed by her fellow co-workers and that she had subsequently reported this harassment to Alagna, the harassment directed at her was not due to Plaintiff's disability or restrictions, but because her co-workers perceived her to be a "runner." (_See_ Pl.'s Dep. Tr. I 64:24-65:19.) That is, earlier in her career, Plaintiff was allegedly targeted by her co-workers because they believed she was completing too many jobs as compared to them and was, thus, making them look bad. (_Id._ at 65-66:16-5.)

D.   <u>Plaintiff's ADA Claims</u>

Generally, the ADA prohibits discrimination "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions and privileges of employment."  42 U.S.C. § 12112(a). Discrimination is defined as, among other things, "limiting, segregating, or classifying a job applicant or employee in a way that adversely affects the opportunities or status of such applicant or employee because of the disability of such applicant or employee" and "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association."  41 U.S.C. § 12112(b)(1), (4).  Furthermore, employers are required to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity."  42 U.S.C. § 12112(b)(5)(A).

Disability discrimination is analyzed under "the burden-shifting framework articulated in <u>McDonnell Douglas Corp. v. Green</u>." 411 U.S. 792 (1973).  <u>Bey v. City of N.Y.</u>, 999 F.3d 157,

165 (2d Cir. 2021).  Under the McDonnell Douglas framework: (1) the plaintiff bears the initial burden of establishing her prima facie case; (2) the employer must then offer, through the introduction of admissible evidence, a nondiscriminatory reason for the allegedly discriminatory action; and then (3) the onus shifts back to the plaintiff to "produce evidence and carry the burden of persuasion that the proffered reason is a pretext."  McBride v. BIC Consumer Prods. Mfg. Co., Inc., 583 F. 3d 92, 96 (2d Cir. 2009); see also Brizzi v. Utica Mut. Ins. Co., 529 F. Supp. 3d 44, 54 (E.D.N.Y. 2021).  Generally, "[a] qualified individual can base a discrimination claim on any of three available theories: (1) intentional discrimination (disparate treatment); (2) disparate impact; and (3) failure to make a reasonable accommodation."  Fulton v. Goord, 591 F.3d 37, 43 (2d Cir. 2009) (citation omitted).

Here, Plaintiff's posits two theories of discrimination: (1) that Verizon failed to make her reasonable accommodations; and (2) disparate treatment.  (See Pl.'s Support Memo at 20-30.)  The Court addresses Plaintiff's failure to accommodate claims first.

45

1. <u>Plaintiff's Failure to Accommodate Claim</u>[9]

A <u>prima facie</u> case for failure to provide a reasonable accommodation under the ADA, requires Plaintiff to show by a preponderance of the evidence that: (1) she "is a person with a disability under the meaning of the ADA"; (2) Defendant is "an employer covered by the statute [that] had notice of [her] disability; (3) with reasonable accommodation, [P]laintiff could perform the essential functions of the job at issue;" and (4) Defendant, as Plaintiff's employer, "refused to make such accommodations." <u>McMillan v. City of N.Y.</u>, 711 F.3d 120, 125-26 (2d Cir. 2013); <u>see also</u> <u>Woolf v. Strada</u>, 949 F.3d 89, 93 (2d Cir. 2020)

Here, the Company neither disputes that it is an employer that is subject to the ADA, nor that Plaintiff is a person that has a disability within the meaning of the ADA.  (<u>See</u> Defs.' Support Memo <u>in toto</u>.)  Instead, the central questions revolve around the third and fourth factors with particular emphasis on the third, that is, whether Plaintiff "was [] qualified to perform

---

[9] While Defendants note that Plaintiff applied for and received SSDI, the medical restrictions discussed by the administrative judge in the SSDI opinion are largely consistent with the medical restrictions Plaintiff had during the relevant time period.  The Court notes further that unlike an ADA claim, "'[t]he Social Security Act does not concern itself with reasonable accommodation.'"  <u>Morse v. JetBlue Airway Corp.</u>, 941 F. Supp. 2d 274, 290 (E.D.N.Y. 2013) (citing <u>DeRosa v. Nat'l Envelope Corp.</u>, 595 F.3d 99, 104 (2d Cir. 2010)).

the essential functions of [her] job, with or without reasonable accommodation."  (Id. at 18.)

"An employee is qualified for a position only if she can perform its essential functions."  McBride, 583 F.3d at 98.  While the ADA does not define the term "essential functions," the EEOC has promulgated regulations that indicate the term "encompasses 'the fundamental job duties of the employment position.'"  Id. (quoting 29 C.F.R. § 1630.2(n)(1)).  Ultimately, whether a given task "constitutes an essential function depends on the totality of the circumstances."  Rodal v. Anesthesia Grp. of Onondaga, P.C., 369 F.3d 113, 120 (2d Cir. 2004).  However, evidence of whether a particular duty is an essential function under the ADA may include:

> (i) The employer's judgment as to which functions are essential; (ii) Written job descriptions prepared before advertising or interviewing applicants for the job; (iii) The amount of time spent on the job performing the function; (iv) The consequences of not requiring the incumbent to perform the function; (v) The terms of a collective bargaining agreement; (vi) The work experience of past incumbents in the job; and/or (vii) The current work experience of incumbents in similar jobs.

Jones v. N.Y.C. Transit Auth., 838 F. App'x 642, 645 (2d Cir. 2021) (citing 29 C.F.R. § 1630.2(n)(3)).

The inquiry into whether a particular function is essential for any given position is a fact intensive one.  Hunt-Watts v. Nassau Health Care Corp., 43 F. Supp. 3d 119, 127

(E.D.N.Y. 2014). Nevertheless, "[a] court must give considerable deference to an employer's judgment regarding what functions are essential for service in a particular position." Shannon v. N.Y.C. Transit Auth., 332 F.3d 95, 100 (citing D'Amico v. City of N.Y., 132 F.3d 145, 151 (2d Cir. 1998)).

### i. Climbing is an Essential Function of the FT Role

Plaintiff argues that climbing is not an essential function of the FT role. (Pl.'s Support Memo at 12-13.) Plaintiff contends that while Section F of the FT Description articulates climbing as a requirement, that the FT Description applies broadly to all roles under the moniker of FT and does not articulate the essential functions of the "Specials" FT. (Pl.'s Reply at 12; Pl.'s Dep. Tr. I 213:20-214:19.)

Additionally, despite admitting that climbing was part of her job, Plaintiff avers that the percentage of time she actually spent on pole jobs was low and that such jobs came in "less than once [per] week." (Pl.'s Reply at 12-13; Pl.'s Dep. Tr. I 223:17-22.) Plaintiff's argument is unavailing. Deposition testimony by Alagna and the Plaintiff establishes that climbing is a skill that could be required from the FT at any time, since one could not accurately predict when it would be necessary.[10]

---

[10] Indeed, as part of their initial training, new FTs are required to attend climbing classes. Plaintiff's own training records reflect that she was required to take pole climbing classes prior

Moreover, there is undisputed testimony in the record that, at least in 2015, there was an increasing volume of pole work coming into Defendant's business. Additionally, Plaintiff's testimony surrounding this period corroborates Defendant's argument that there was an increase in pole work and, thus, climbing, in 2015. Due to her no-climbing restrictions, Plaintiff was unable to complete these jobs. (Id. at 205:14-20.) Plaintiff offers no evidence to refute that in 2015 there was an increased number of jobs requiring climbing or Alagna's estimations on the matter. Similarly, Plaintiff offers no evidence that once reassigned back to Specials North in 2015, the volume of pole work decreased. Rather, the record reflects the opposite: In 2015, there was an increase in work that required climbing and that because of Plaintiff's inability to climb, her supervisor struggled to assign her work.

Thus, from the record evidence, including Plaintiff's admissions about climbing, the Court finds that climbing, whether by use of a pole or a ladder, is an essential function of the FT role. The Court further finds that Plaintiff was unable to perform this essential function without an accommodation.

---

to becoming an FT in 2006. (See Pl.'s Training Records, Ex. 25, ECF No. 71-6, attached to Pl.'s 56.1 Counterstmt.)

ii.   Lifting At Least 60-Pounds is Also an Essential
      Function of the FT Role

Additionally, the parties dispute the extent to which
Plaintiff's role required her to be able to "[m]ove[] and/or
lift[] 100 pounds or more" as articulated in Section G of the FT
Description.  In her deposition, Plaintiff admitted that she could
not lift 100-pounds but she argues that she was never required to
lift this much in her role as an FT; instead, she never had to
lift more than 60-pounds.  There is some interplay between the
lifting requirement and the climbing requirements as in the
present context, they are inter-dependent.  Given the Court's
previous finding that climbing is an essential function of the FT
role, it holds that the ability to carry the tools necessary to
facilitate the FT's ability to climb is also an essential function
of the role.  The Court need not determine the exact poundage that
encompasses this requirement; instead, the Court construes
Plaintiff's argument on this point as an admission that an
essential function of the FT is to lift at least 60-pounds.

Since it is undisputed that beginning approximately in
2007 Plaintiff has had medical restrictions that preclude her from
"lifting, pushing, or pulling over 25-pounds," the Court likewise
finds that, without accommodations, Plaintiff cannot perform this
essential function of the FT role either.  Thus, since the Court
finds that both: (1) climbing; and (2) lifting at least 60-pounds,

50

are essential functions of the FT role, and that Plaintiff can do neither without accommodation, the next issue to address is whether Plaintiff can show that she would have been able to perform these functions with some sort of reasonable accommodation.

    iii.  <u>Plaintiff's Proposed "Reasonable" Accommodations</u>

In discrimination claims based both on adverse employment actions and on failures to accommodate, the plaintiff "bears the burden of both production and persuasion as to the existence of some accommodation that would allow her to perform the essential functions of her employment, including the existence of a vacant position for which she is qualified." <u>McBride</u>, 583 F.3d at 97 (citing <u>Jackan v. N.Y.S. Dep't of Labor</u>, 205 F.3d 562, 566 (2d Cir. 2000)); <u>Borkowski v. Valley Cent. Sch. Dist.</u>, 63 F.3d 131, 137-38 (2d Cir. 1995)).  Plaintiff's burden to demonstrate the existence of a reasonable accommodation "is not a heavy one, requiring only that the plaintiff 'suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits.'" <u>Francis</u>, 177 F. Supp. 3d at 771 (citing <u>Borkowski</u>, 63 F.3d at 138).  A reasonable accommodation "may include adjustments to work schedules or other job restructuring." <u>McMillan</u>, 711 F.3d at 127 (citing 45 C.F.R. § 84.12(b)); <u>see also</u> 29 C.F.R. § 1630.2(o)(2).  However, "[a] reasonable accommodation can never involve the elimination of an essential function of a job." <u>McMillan</u>, 711 F.3d at 127 (quoting

Shannon, 332 F.3d at 100).  Ultimately, the process of determining a reasonable accommodation is a collaborative one between employer and employee in which "[b]oth parties must participate."  Goonan v. Fed. Reserve Bank of N.Y., 916 F. Supp. 2d 470, 480 (S.D.N.Y. 2013).

(a) Even if timely, None of Plaintiff's Requested Accommodations Would Aid Her in Performing the Essential Functions of the FT Role

As an initial matter, Plaintiff argues that her inability to climb and her lifting restrictions could have been reasonably accommodated by Verizon if it had provided her with a bucket truck.  (See Pl.'s Support Memo, at 25-26; Pl.'s Reply at 13-15.)  Even if this denied accommodation was not time-barred, which it is, a bucket truck would not have enabled Plaintiff to effectively carry out and complete aerial work as an FT.  Plaintiff testified that to complete a pole job, the FT must climb the pole manually if there are steps; where there are no steps and a connection needs to be made to the pole, Plaintiff testified that the FT would have to use the 24-foot ladder.  (Pl. Dep. Tr. I 96:11-21.)  In testifying as to her understanding of pole jobs, Plaintiff stated that a bucket truck would be used where the pole was designated a "no-climb pole."  (Id.)

Evidence in the record establishes, and Plaintiff admits, Plaintiff was not trained to use a bucket truck and that,

most importantly, a bucket truck cannot handle all types of aerial job.  As such, depending upon environmental or other factors, the usage of a bucket truck would not always obfuscate the need for an FT to climb.  Even if the bucket truck request was a reasonable accommodation, which this Court finds that it is not, the record reflects that Verizon had nondiscriminatory reasons for denying Plaintiff's request, which was accepted by Plaintiff, namely that there were limited bucket trucks available and that those that were available were primarily used to repair cable in a manner inconsistent with Plaintiff's restrictions.  In circumstances similar to Plaintiff's, courts have held that a request for a bucket truck is not a reasonable accommodation.  Klik v. Verizon Va. Inc., No. 6:15-CV-0002, 2016 WL 917499, (W.D. Va. Mar. 8, 2016) (finding that a bucket truck request is an unreasonable accommodation for an employee's inability to climb since "due to terrain, the bucket truck becomes useless at some job sites" and that "it would not be reasonable to take the only working bucket truck away from a fully functioning employee that can do every job and give it to an employee that is limited and may or may not be able to perform the task upon arriving at the location").[11]

---

[11] While the court in Shannon v. Verizon N.Y., Inc. found that a request for a bucket truck was an accommodation that met the facial reasonableness standard, the Shannon court failed to expound upon the reasoning behind its decision.  For this reason, the Court declines to follow it.  519 F. Supp. 2d 304, 309 (N.D.N.Y. 2007).

Likewise, Plaintiff's argument that she requested and was denied a lighter ladder, even if not time barred, is not a reasonable accommodation that would have allowed her to perform aerial work. While Plaintiff may have, at one point, had a 25-pound six-foot A-Frame ladder, the record evidence establishes that FTs are required to use various tools to facilitate their climbing, including a 24-foot ladder. Thus, even if Plaintiff's A-Frame ladder allowed her to engage in some climbing, it would not have allowed her to climb poles or work aloft on anything higher than six-foot above head height. Moreover, Plaintiff's restrictions actually state that she cannot climb, at all, rendering her lighter-ladder accommodation argument without merit. (See Dzugan Dep. Tr. 174:16-175:2) (testifying that he questioned Plaintiff's use of the 25-pound, six-foot ladder because Plaintiff's restrictions state "no climbing").

Plaintiff argues in the alternative that Verizon could have accommodated her by continuing to limit her to groundwork, as they had done until May 2015. (Pl.'s Support Memo at 10, 23.) Again, even if this were a timely claim, a reasonable accommodation cannot eliminate an essential function of the role. See McMillan, 711 F.3d at 127. The Court has already found that climbing is an essential function of the FT role and, as such, limiting Plaintiff to groundwork would not be a reasonable accommodation. Moreover, the fact that Verizon may have provided unreasonable

54

accommodations in the past does not mean that it must continue to provide such accommodations.  See Uhl v. Home Depot U.S.A., Inc., No. 08-CV-3064, 2010 WL 3282611, at *5 (E.D.N.Y. Aug, 13, 2010) (finding that where an employer has "exceeded its legal obligations, by affording [an employee] a more than reasonable accommodation" in the past, the employer is not compelled "to continue to accommodate [that employee] beyond what the law requires" (emphases in original)).

> (b) Defendant Placed Plaintiff Into its HIC
>     Program But Was Unable to Accommodate
>     Plaintiff With a Transfer

Without determining the timeliness of Plaintiff's allegations surrounding Verizon's alleged failures to timely implement the HIC Process, the Court finds that Plaintiff was placed into the HIC Program and that Verizon attempted to transfer her to other departments.  Further, the job opportunities which Plaintiff states she missed out on were positions for which Plaintiff was unqualified.

In support of her failure to accommodate claims and her disparate treatment claims, Plaintiff argues that Verizon failed to properly initiate the HIC Process and subsequently engage with Plaintiff to help find either reasonable accommodations for her or a transfer.  (Pl.'s Reply at 17-18.)  Further, Plaintiff alleges that due to the confusion surrounding when exactly the HIC Program was initiated, she missed out on open positions at the CO for which

she should have received priority consideration. (Id.; Pl.'s Support Memo, at 13.)  Plaintiff argues that a transfer to the CO was a reasonable accommodation that Verizon could have made to accommodate her restrictions. (Pl.'s Reply at 17-18.)

The written job description for the COT role includes: a 60-pound lifting requirement, the requirement to use light-to-heavy equipment and ladders; and being able to climb poles. Additionally, Plaintiff's testimony that COTs use smaller ladders is in direct contrast with Alagna's testimony that COTs' ladders can weigh from 50 to 75 pounds.  As such, Plaintiff's conclusory assertions that the CO position "did not implicate any of [Plaintiff's] restrictions" is unavailing.  Plaintiff offers no evidence to support her assertions that she could have performed the role of a COT with her restrictions, other than her own anecdotal experiences during the time she spent there on loan. However, Monfredo states that Plaintiff's experience while on loan in 2011 was not reflective of the typical day-to-day work of a COT. (Monfredo Decl. ¶¶ 3, 4.)  Given the differences between the work and skills conducted by FTs and COTs Monfredo highlighted further that, even if Plaintiff could have performed the essential functions of the COT Role, which she could not, that it would have required Verizon to provide Plaintiff with "significant training to be considered qualified." (Id. at ¶ 7.)  Plaintiff's anecdotal

evidence, in light of Verizon's competent evidence, is insufficient to defeat summary judgment.

Regarding Plaintiff's argument that a transfer to another open role could have been an appropriate accommodation, the record shows that there was an active search for alternative positions within Verizon, from June 2015 through August 2015, on Plaintiff's behalf but that no department could accommodate her with her restrictions. Therefore, Plaintiff's speculative argument is unavailing.

Additionally, Plaintiff makes much of the fact that Murray applied to MetLife to substantiate Plaintiff's restrictions for one-year and speculates that Murray's motive in doing so was to place Plaintiff on short-term disability. (Pl.'s Support Memo at 12, 14.)  Plaintiff offers no evidence to substantiate her speculation on this issue.  Regardless, Plaintiff's restrictions were medically substantiated by MetLife, Verizon's disability coordinator, based upon Plaintiff's own medical records. (Pl.'s Dep. Tr. II 329:17-330:5.)  The record evidence shows that, while procedurally some of the HIC forms were missing certain information, including that Plaintiff understood the HIC process, Verizon substantially complied with its internal procedures, and it ultimately did insert Plaintiff into the HIC Program.[12]  Contra

---

[12]  Plaintiff's argument that Verizon failed to engage in an interactive process with her once she was in the HIC Program is

Goonan v. Fed. Rsrv. Bank of N.Y., 916 F. Supp. 2d 470 (S.D.N.Y.
2013) (finding that Federal Reserve took adverse action against
employee when it refused to allow the employee to participate in
a policy that it afforded to a significant number of other
employees).  Further, the procedural deficiencies in Plaintiff's
HI-3 form are immaterial since she received notice via letter that
accurately described the process and Plaintiff's responsibilities
to actively engage in that process as well as providing contact
information if Plaintiff had any queries.

As such, Plaintiff's motion for summary judgment on her
failure to accommodate claim is denied, and Defendant's motion for
summary judgment on Plaintiff's failure to accommodate claim is
granted.

2. Plaintiff's Disparate Treatment Claim must [13]

Under the McDonnell Douglas framework, Plaintiff bears
the initial burden of establishing, by a preponderance of the

---

also unavailing.  See McBride, 583 F.3d at 101 (Holding that an
employer's failure to engage in an interactive process "does
not form the basis of a claim under the ADA and evidence thereof
does not allow a plaintiff to avoid summary judgment" unless
plaintiff can establish that "with the aid of some identified
accommodation, she was qualified for the position at issue").

[13] To the extent Plaintiff alleged that she was not paid for certain
days on March 2, and March 3 2015, and that she was denied
overtime opportunities in August 2015, the Court construed these
allegations as evidence of her disparate treatment claim.
Regardless, like the majority of Plaintiff's allegations, these
allegations are also time-barred since the complained of conduct
occurred prior to October 8, 2015.

evidence, her prima facie claim of discrimination by disparate treatment.  Fox v. Costco Wholesale Corp., 918 F.3d 65, 71 (2d Cir. 2019).  To establish "a prima facie case of discrimination based on disparate treatment" Plaintiff must show that: "'(1) [her] employer is subject to the ADA; (2) [she] was disabled within the meaning of the ADA; (3) [she] was otherwise qualified to perform the essential functions oh [her] job, with or without reasonable accommodation; and (4) [she] suffered adverse employment action because of [her] disability." Id. (citing McMillan, 711 F.3d at 125.)

Here, since the Court has already found that Plaintiff was not "otherwise qualified to perform the essential functions of [her] job, with or without reasonable accommodation," (see supra Discussion Part II-D), Plaintiff's disparate treatment claim must fail.  Consequently, Plaintiff's motion for summary judgment on her disparate treatment claims is denied, and Defendant's motion for summary judgment on Plaintiff's disparate treatment claims is granted.

To the extent not explicitly addressed, the Court has considered the remainder of Plaintiff's arguments both in support of her motion, and opposing the grant of Defendants' Cross-Motion and it finds them to be without merit.

CONCLUSION

For the stated reasons, **IT IS HEREBY ORDERED** that Plaintiff's Motion (ECF No. 70) is DENIED.

**IT IS FURTHER ORDERED** that the Defendants' Cross-Motion (ECF No. 76) is GRANTED.


SO ORDERED.

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated: February 9, 2023
       Central Islip, New York